MICHAEL LAMB v. STATE OF NEBRASKA.

FILED MAY 2, 1894. No. 5733.

1. The admission of incompetent testimony to prove a fact is harmless error, where such fact is established by other sufficient uncontradicted evidence.

2. To constitute a larceny of an estray, converted to his own use by the finder, the felonious intent to misappropriate must have existed at the time of the taking of the estray into his possession.

3. Where the felonious intent is formed after the possession of the animal is acquired, the finder is not guilty of larceny, although he subsequently appropriates the property to his own use.

4. In a prosecution for larceny of a stray animal it is not necessary to the conviction of the accused that, at the time of taking the property, he should have known, or have had reason to believe, who was the owner thereof.

5. Criminal Law: ACCOMPLICE: EVIDENCE: INSTRUCTIONS. It is not error to refuse an instruction to the effect that a person accused of a crime cannot be convicted upon the uncorroborated testimony of an accomplice. The weight to be given the testimony of such a witness is for the jury to determine, after a careful examination of the same, in the light of all the other evidence in the case.

6. A conviction may rest on the uncorroborated evidence of an accomplice, when, considered with all the testimony, it satisfies the jury beyond a reasonable doubt of the guilt of the accused.

ERROR to the district court for Boone county. Tried below before HARRISON, J.

W. F. Critchfield and M. B. Gearon, for plaintiff in error.

George H. Hastings, Attorney General, for the state.

NORVAL, C. J.

The plaintiff in error, Michael Lamb, was accused by information filed by the county attorney in the district court, of the crime of grand larceny, committed by feloniously stealing and carrying away "one black registered sow, with white points, with nick in left ear, named Black Queen, register number 13770 S," of the value of $75, of the personal property of one J. C. Hardman.   The accused was convicted, and the value of the sow was fixed by the verdict at $25.   On the trial the state was permitted to introduce in evidence, over the objection and exception of the defendant, a certificate of the registration of the pedigree of the sow in question, which certificate purported to be signed by Ira K. Alderman as secretary of the Standard Poland-China Record Association of Maryville, Missouri, and authenticated with the seal of said association.   The admission in evidence of this paper or document is urged as a reason for a reversal of the case.   It would have been better had the county attorney not inserted in the information the allegation as to the registration of the animal, as such averment was not essential to the validity of the information. Had it been omitted, the state would not have been called upon to prove the pedigree of the sow; but having alleged the same, it became a part of the description of the property, and therefore it was incumbent on the prosecution to establish it, by competent evidence, substantially as averred.   That the certificate introduced was incompetent to prove the fact of registration, it requires no argument to show.   We have been cited to no case which holds such a certificate is admissible, and we do not believe any such can be found.   But the accused was not prejudiced by the ruling, since it had already been established by other proof that the sow was a thoroughbred Poland-China, and that she was a duly registered animal, and no testimony was introduced or offered by the defendant to dispute that fact.

The evidence objected to was merely cumulative upon a question upon which no additional proof was r, quired, and the admission thereof was therefore harmless error.

Another reason urged for reversal is that the evidence fails to sustain the charge of larceny. The testimony on the part of the state tended to establish the following facts: The complaining witness, J. C. Hardman, and the defendant were neighbors, their farms being less than a mile apart. The sow in controversy was owned by Hardman, and had either escaped from his pasture, or had been let out. Afterwards, on a Sunday in September, 1891, the sow came to the premises of the defendant, and during his absence from home R. L. Nickerson and William Collins, employes of the defendant, and who resided with him at the time, drove her into the defendant's hog lot, where she remained until his return home that evening, when the defendant was informed what had been done. Although it was known to the defendant, and the other parties, that the animal belonged to Hardman, he was not informed that she was in defendant's possession, but was kept until Thursday night of the same week, when about 11 o'clock the defendant Lamb, Nickerson, and Collins loaded her into defendant's wagon, and with his team she was taken by Collins and Nickerson to the farm owned by Collins' father, some four or five miles distant, where she was left until she was subsequently discovered and claimed by her owner. It further appeared in evidence that the sow was taken to the Collins farm to prevent the owner from finding her, and that it was agreed between Lamb, Collins, and Nickerson, prior to the removal of the animal, that all should share in the proceeds whenever the same should be sold. The facts, of which the above is only a brief summary, were testified to positively by both Collins and Nickerson. There is in the bill of exceptions testimony of other witnesses for the state tending to connect the accused with the transaction. While it is also true that the

defendant, when upon the witness stand, denied having anything to do with the loading of the sow and her removal to the Collins' farm, and he is to some extent corroborated by the testimony of one or more members of his family, we are convinced that the jury were warranted in returning the verdict they did.   If the testimony of the witnesses for the state is true, and of which fact the jurors, who heard the evidence and saw the witnesses, were the sole judges, it establishes a conversion of the animal by the plaintiff in error.   It is contended that there is no evidence in the record tending to show an intent on the part of the accused to convert the property at the time it came into his possession, but on the other hand that the testimony in behalf of the state is to the effect that he had no such intention until long after he was advised that the sow was in his possession.   If the record so disclosed, we concede that the contention would not be without merit, since the animal, when it came into possession of the plaintiff in error, was an estray.   In order to constitute larceny of an estray, converted by the finder to his own use, the felonious intent to misappropriate the same must have existed at the time the estray came into his possession.   If the felonious intent is formed after possession has been acquired, the subsequent misappropriation of the estray will not amount to a larceny. (*Commonwealth v. Mason*, 105 Mass., 163; *Starck v. State*, 63 Ind., 285 ; *Griggs v. State*, 58 Ala., 425.)

There is testimony in the bill of exceptions from which the inference can be drawn that the intention to misappropriate the sow existed at the time the plaintiff in error first ascertained that she was on his premises.   The witness Nickerson testified that he had a conversation with Lamb the day the animal was turned into his enclosure.   The witness details the conversation thus : " When he [defendant] came home—I don't know just how it came up, but I told him that there was one of Mr. Hardman's sows in the pen.   He wanted to know how it came there, and I told

him it came there and we turned it in, and I told him what
I told the women, that if Hardman came there inquiring
for a hog to tell him there was a sow in the pen; and he
asked me what I done that for, and I don't know what
answer I made.  He says then, 'I don't believe we had
better let him have it back, had we?'  I says, 'I don't
know.'  He says, 'I guess we hadn't;' he says, 'the son of
a bitch can get along without it,' something to that effect.
That was all that was said at that time."  This testimony,
if true, was sufficient to justify the finding that Lamb in-
tended to convert the animal to his own use when he first
learned that it was upon his premises.  In argument it
is said the record is silent as to whether plaintiff in error
ever saw the sow until it is claimed he assisted in loading
her in the wagon on Thursday night.  It is quite imma-
terial whether he had seen the animal or not, since she was
at all times in his possession, and under his control.  Con-
ceding that she was not in the possession of plaintiff in
error from the time she was turned into his lot until Thurs-
day night, she was in his possession when he helped to load
her, and by that act his intention to misappropriate was
made manifest.  The evidence supports the verdict.

Objections are made to the ninth and tenth paragraphs
of the instructions of the court, which read as follows:

"9. You are instructed that if you believe from the
evidence beyond a reasonable doubt that the defendant
took the animal mentioned in the information into his pos-
session, or found it running with his stock, and at the time
he so took it, or found it, knew it was not his own, and
that he then and there intended to steal and convert it to
his own use, and to deprive the owner of his property, who-
ever he might be, and at the time took possession of the
animal and held such possession with such intention, this
would amount to the crime of larceny, provided you find
all other material allegations of the information proved
by the evidence beyond a reasonable doubt.

"10. You are instructed that if from the evidence in this case that the animal mentioned in the information was an estray, and that the defendant took it into his possession, or found it running with his stock, and took care of and fed it with his own stock, and that when he first obtained possession of it or discovered it with his stock he did not intend to steal it or feloniously convert it to his own use, then he would not be guilty of larceny, although you may find from the evidence beyond a reasonable doubt that he afterwards converted it to his own use with intent to deprive the owner of it."

It is insisted that these instructions are inapplicable to the evidence, and therefore were misleading. This objection is not well taken. They were based upon the testimony in the case. The further objection is made to the ninth instruction, that it omitted to inform the jury that the plaintiff in error could not be convicted, unless, at the time of the conversion, he knew, or had the means of ascertaining, who was the owner of the property, and the case of the *State v. Boyd*, 32 N. W. Rep. [Minn.], 780, is cited by counsel in support of the proposition. That was a prosecution for larceny against the finder of lost property, and the court held that "it is not necessary that the finder should know who the owner is, but he must have such means of inquiry on that subject as to give him reason to believe that, with reasonable effort on his part, the owner will be found." That decision was based upon a statute of Minnesota, which makes a person who finds lost property, "under circumstances which give him knowledge or means of inquiry as to the true owner," guilty of larceny, if the finder appropriates such property to his own use, or to the use of another person who is not entitled thereto, without first having made every reasonable effort to find the owner and restore the property to him. In this state we have no such statute, hence the case cited is not an authority upon the question under consideration. Whether

plaintiff in error knew who was the owner of the property was wholly immaterial. As was stated by Napon, J., in *State v. Martin*, 28 Mo., 537: "It is with no propriety, either in view of custom or statutory law, that animals can be called lost goods here, simply because they are outside of the owner's enclosures and the owner does not know where they are. Such animals are not lost in the proper sense of the term, nor can the person, who comes across them and feloniously appropriates them to his own use, with any propriety be called the finder, as he might be if he, with the same felonious intent, picked up a purse upon the highway. A person does not lose the possession of his horses or cattle here because they happen to be outside of his enclosures, and 'e may not be able at any given time to lay his hands upon them. They are still in his possession, as much as though they were in his stable or pasture. Nor can it make any difference that they have gone five or ten miles from their ordinary range. The owner is as entirely ignorant of their precise position in the former as in the latter case; and the fact that they are branded or not branded with the owner's name is perfectly immaterial. It is sufficient for the person who comes across them to know that they are not his property; and if he drives them off and converts them feloniously to his own use, he is as much guilty of larceny when he is ignorant of their true owner, and their owner is ignorant of where they are, as he would be if both he and the owner had full knowledge on both these points." To the same purport is *Brooks v. State*, 35 O. St., 46; *Baker v. State*, 29 O. St., 184. In the last case the rule is well stated in the syllabus thus: "When a person finds goods that have been actually lost, and takes possession with intent to appropriate them to his own use, really believing at the time, or having good ground to believe, that the owner can be found, it is larceny." The ninth instruction stated the correct rule upon the subject, was applicable to the testimony, and therefore the trial judge did not err in giving it.

Complaint is made because the court refused to give the following instruction requested by the plaintiff in error:

" 1. You are instructed that while the testimony of witnesses who claim to be accomplices with the defendant in the commission of the offense charged is received in evidence, in determining the weight to be given to such testimony, the jury should use great caution, and unless the testimony of Robert Nickerson and William Collins is corroborated by other evidence in some material point in issue, it would be dangerous and unsafe to convict upon such evidence, and you are at liberty to disregard it entirely."

This request to charge was properly refused. A person may be convicted of a crime upon the unsupported testimony of an accomplice if such testimony is true. The rule as to accomplices as witnesses was accurately stated by the twelfth instruction given by the court on its own motion, in the following language: " While it is a rule of law that a person accused of crime may be convicted upon the testimony of an accomplice or accomplices, still, a jury should always act upon such testimony with great care and caution, and subject it to careful examination, in the light of all the other evidence in the case, and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony, they are satisfied beyond a reasonable doubt, of its truth, and that they can safely rely upon it." This instruction was doubtless taken from Sackett's Instructions to Juries, and stated the correct rule. (*Olive v. State*, 11 Neb., 3.)

We are unable to discover any prejudicial error in the record, and the judgment is

AFFIRMED.

HARRISON, J., having presided in the court below, took no part in the above decision.